UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK BRIMMEIER,

      Plaintiff,

                                   Case No. 2:20-cv-10426-BAF-DRG

vs.                               Hon. Bernard A. Friedman

                                   Mag. Judge David R. Grand

DeMARIA BUILDING COMPANY,
A Michigan Corporation,
DeMARIA BUILDING COMPANY
DEFERRED COMPENSATION PROGRAM,
An ERISA Plan.

      Defendants.

_____

| | |
|---|---|
| FRANK & FRANK LAW | JAMES S. ROSENFELD (P39434) |
| By: JONATHAN B. FRANK (P42656) | BUTZEL LONG, PC |
| JANETTE E. FRANK (P42661) | Attorneys for Defendants |
| Attorneys for Plaintiff | 150 W. Jefferson, Suite 100 |
| 3910 Telegraph Road, Suite 200 | Detroit, Michigan 48226 |
| Bloomfield Hills, Michigan 48302-1461 | (313) 225-7000 |
| (248) 723-8691 | rosenfeld@butzel.com |
| jonfrank@frankandfranklaw.com | |
| janfrank@frankandfranklaw.com | |

_____

## PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

Table of Authorities ...............................................................................iii, iv

Statement of the Issues Presented ...................................................................v

Controlling Authority .....................................................................................v

Introduction .....................................................................................................1

Background Facts .............................................................................................1

Argument .......................................................................................................14

Legal Standards .............................................................................................15

    1. Mr. Brimmeier Was Terminated From DBC ....................................18

    2. The 2016 Plan Does Not Modify the Terms for the Period Before it Was Implemented ....................................................................................20

    3. Mr. Brimmeier is Entitled to Interest and Attorney Fees ..................22

Conclusion and Relief Requested ..................................................................24

979033/17582.0001

# TABLE OF AUTHORITIES

Cases:

*Alexander v. CareSource,* 576 F.3d 551 (6th Cir. 2009) ...............................16, 17

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................16

*Brown v. AMPCO-Pittsburgh Corp.,* 876 F.2d 546 (6th Cir. 1989) ..........................15

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .............................................16

*Ciminillo v. Streicher,* 434 F.3d 461 (6th Cir. 2006)...................................16

*Drennan v. General Motors Corp.,* 977 F.2d 246 (6th Cir. 1992) .............................23

*Everson v. Leis,* 556 F.3d 484 (6th Cir. 2009)) ...........................................17

*First Tr. Corp. v. Bryant,* 410 F.3d 842 (6th Cir. 2005)...............................23, 24

*Holland v. Earl G. Graves Publishing Co.,* 33 F.Supp.2d at 584 ...............................23

*JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co.,* 750 F.3d 573 (6th Cir. 2014) ..................................................................................22

*Lewis v. Philip Morris, Inc.,* 355 F.3d 515 (6th Cir. 2004) ........................................17

*Lim v. Miller Parking Co.,* 560 B.R. 688 (E.D. Mich. 2016).....................................18

*Pittman v. Cuyahoga County Dep't of Children & Family Servs.,* 640 F.3d 716 (6th Cir. 2011)......................................................................16

*Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.,* 157 F.3d 775 (10th Cir. 1998).......................................................................22

*RSM Richter, Inc. v. Behr America, Inc.,* 781 F.Supp.2d 511 (E.D. Mich. 2011) ......23

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,* 475 F.3d 783 (6th Cir. 2007)…18

*Wallace v. Oakwood Healthcare, Inc.* 954 F.3d 879 (6th Cir. 2020)..........................16

iii

*Wilkins v. Baptist Healthcare Sys., Inc*., 150 F.3d 609 (6th Cir. 1998).......................17

*Williams v. Int'l. Paper Co.*, 227 F.3d 706 (6th Cir. 2000) ..........................................v, 21

*Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446 (6th Cir. 2001) ...................................16

*Zack v. McLaren Health Advantage, Inc.,* 340 F. Supp. 3d 648 (E.D. Mich. 2018)...18

Statutes and Regulations:

29 U.S.C. §1132(a) ......................................................................................... v, 15

29 U.S.C. §1132(g)(1)) ....................................................................................... 23

26 C.F.R. §1.409A-1 .......................................................................................... 4

29 C.F.R. § 2560.503-1(l)(1) ............................................................................ 15

Fed. R. Civ. P. 56(a)........................................................................................16

MCL 438.7 ....................................................................................................... 23

MCL 438.31 ..................................................................................................... 23

979033/17582.0001

## STATEMENT OF THE ISSUES PRESENTED

Plaintiff is entitled to judgment in his favor because Defendant's termination of Plaintiff in January, 2018 entitles Plaintiff to payment under Defendant's Deferred Compensation Plan (whether the pre-2016 unwritten plan or the 2016 written plan).

## CONTROLLING AUTHORITY

29 U.S.C. §1132(a)

*Williams v. Int'l. Paper Co.*, 227 F.3d 706 (6th Cir. 2000)

979033/17582.0001

# INTRODUCTION

Mark Brimmeier worked for DeMaria Building Company ("DBC") for over 20 years, most of that at an executive level. Through the end of 2015, he earned performance bonuses of $412,019 that were "banked" in an unwritten deferred compensation plan (the "Pre-2016 Plan") and tracked in a DBC account. In 2016, DBC implemented a written plan (the "2016 Plan") but did not make any contributions on Mr. Brimmeier's behalf under that plan.

In early 2018, DBC terminated Mr. Brimmeier's employment with DBC without cause, forcing him into a job with a brand new company called Ally, LLC in a different business (owner's representative work). It is undisputed that termination without cause is a triggering event under the Pre-2016 Plan and the 2016 Plan, meaning that Mr. Brimmeier became entitled to payment of his $412,019. Therefore, summary judgment should be awarded to Mr. Brimmeier.

# BACKGROUND FACTS[1]

### *Mr. Brimmeier Earns Deferred Compensation*

Mr. Brimmeier began earning "banked bonuses" in 2001 when he became DBC's Assistant Vice-President for Health Care. At that point, DBC had no written plan or other conditions restricting Mr. Brimmeier's right to receive all these

---

[1] Unless otherwise stated, these facts are supported by Mr. Brimmeier's Declaration. Exhibit A.

121117/17582.0001

"banked bonuses" upon his termination from DBC, regardless of the circumstances.

This may have been an oversight by DBC, but that is not Mr. Brimmeier's problem.

Here is the universe of pre-2016 documents mentioning the Pre-2016 Plan:

- A handwritten note DBC made in 2011. According to that note, Mr. Brimmeier was "confused" about the program, and Joe DeMaria explained that Mr. Brimmeier would lose his benefits "if he quit." DBC considered this to be "golden handcuffs." Exhibit B. There were no other conditions in this document;
- A 2012 compensation summary explaining that 50% of Mr. Brimmeier's bonus would be "banked." Exhibit C. There were no conditions. The mathematical summary showed $261,672 had been "banked." Exhibit D (see DBC000013);
- A 2013 compensation summary again explaining that 50% of his bonus was banked. Exhibit E. There was now one condition: the benefit would be forfeited "upon voluntary termination of employment." Mr. Brimmeier testified that this was the first time he was told of such a condition. Brimmeier Dep., Exhibit F, at 74-77. There was no mention of age 65, retirement, or a 10-year payment. Due to a very successful year, his banked bonus increased to $318,917. Exhibit D (see DBC000012);
- A 2014 compensation summary added a new condition: that the banked bonuses would be forfeited if Mr. Brimmeier was terminated "for cause," which was not defined but included, for example, "embezzlement" but not poor job performance. Exhibit G; J. DeMaria Dep., Exhibit H, at 15-16. His total banked bonus increased to $377,536. Exhibit D (see DBC000009);
- The 2015 summary removed this new condition; forfeiture was only "upon voluntary termination of employment." Exhibit I. The banked total was now $412,019. Exhibit D (see DBC000010). DBC internal financial statements reflected this obligation as it grew over time. Exhibit J. DBC made no further contributions on Mr. Brimmeier's behalf.

To say Mr. DeMaria's deposition was unclear about the terms of the Pre-2016

Plan would be an understatement. One thing was clear: "Q: If DeMaria terminates

without cause, is that a forfeiture under the pre-2016 plan? A: No." J. DeMaria Dep., Exhibit H, at 8:16-18. That covers Mr. Brimmeier, as will be explained below.

Here is what Mr. DeMaria said about the terms that he vaguely said had been "verbally stated for many years": "That deferred comp was set aside that if you left the company you would lose it. If we fired you, terminated you, you would get to keep it at retirement." *Id.,* at 7:5-8. Since that made no sense (a fired employee would get their money "at retirement"?), he was asked to clarify, and he tried, saying: "If you were terminated by DeMaria, you would get to keep it at retirement, unless it was with fault, then you would also lose it." *Id.*, at 7:11-13. The Court will have to read the next few exchanges to understand how little sense Mr. DeMaria continued to make. He threw in an "age 65" condition. Then "age 60." Then confused the verbal plan with the written plan. Then he discarded the concept of retirement entirely, suggesting that an employee fired without cause at age 50 would have to wait until age 65 to collect the benefit. Then he added another condition: payments would be made over 10 years. When asked if there were documents supporting his position, he referred to the one-page memos from 2013 to 2015. *Id.*, at 10-12. But significantly, none of these memos refers to "age 65" or any age. Mr. DeMaria could not recall any document with this age condition. *Id.*, at 11:10-14. None refers to a 10-year payout either. His confusion is all the more remarkable considering how central this issue is to the litigation.

Mr. Brimmeier testified that "My understanding was always that money was set aside for my retirement. When I retired, I would get that money at that point." Exhibit F, at 61:6-8, 74:7-8, 82:15-19. He said there was "no set age" and nobody ever told him what "retirement" meant. *Id.*, at 63:3-8. This is consistent with DBC's own documents and Mr. DeMaria's testimony, which included the notion that Mr. Brimmeier would be entitled to receive his benefit if he was terminated without cause. Mr. Brimmeier also explained that if he retired from DBC at age 45 to work for another company, he would still be entitled to the balance in his account. *Id.*, at 63:15-20.

This brings us to the 2016 Plan. Exhibit L. This Plan does not on its face cover the period before April 7, 2016, the date DBC signed it. Indeed, the regulation cited by DBC (called Section 409A) provides that "For purposes of this paragraph (c)(3), a plan is established on the latest of the date on which it is adopted, the date on which it is effective, and the date on which the material terms of the plan are set forth in writing." 26 C.F.R. §1.409A-1. The 2016 Plan was therefore established no earlier than April 7, 2016. If Mr. Brimmeier had received "Deferred Compensation" under the 2016 Plan, which he did not, Mr. Brimmeier would have been entitled to start receiving distributions on September 2, 2019, when he reached age 60. This was the

121117/17582.0001

first time age was listed as a factor. Mr. DeMaria explained that the age 60 condition was included at Mr. Brimmeier's request. J. DeMaria Dep., Exhibit H, at 12:2-4.[2]

Significantly, and undisputedly, DBC never contributed a penny after the 2016 Plan was created. All of Mr. Brimmeier's "banked" account existed as of 2015.

Given this history, the Court should view DBC's earlier statement of certain "facts" with a skeptical eye. Taking Mr. Brimmeier's deposition testimony out of context, DBC asserted in an earlier brief that he said he would *only* be entitled to his benefit under the Pre-2016 Plan if he did not go to work for another company. No. He did not say that all. He merely acknowledged one obvious example of retirement: if he left DeMaria but did not work anywhere else. Twisting this testimony, DBC argued that Mr. Brimmeier somehow testified that this example was the *exclusive* definition of retirement. The Court will have difficulty finding support for DBC's argument in the transcript. DBC's "gotcha" moment is nothing more than a strained reading of his testimony.

### Termination of Mr. Brimmeier's Employment with DBC and then Ally

DBC's admitted desire to use "golden handcuffs" to retain Mr. Brimmeier proved successful. He kept working through 2016 in his capacity as Vice-President Health Care/University. He assumed he would "retire as a DeMaria employee."

---

[2] Curiously, DBC suggests that "new" Treasury Regulations triggered the drafting of the 2016 Plan. But the regulations are dated 2007 and went into effect in 2008. DBC was eight years late.

5

Exhibit F, at 80:6. He was perfectly happy in his job, and had no plan to leave. His mid-2015 review stated that he had the "leadership, relationship and technical skill set to successfully grow the company." Exhibit M (see Question 6 of 7).

At the end of 2016, however, DBC turned the tables on Mr. Brimmeier. Due to an internal power play, and not due to any problems with Mr. Brimmeier's performance, DBC took his job away. Mr. DeMaria's Declaration euphemistically refers to this as a "restructuring." DeMaria Decl., Exhibit K, ¶17. Mr. Brimmeier's was moved into a sales and marketing position without any training, his salary was cut 5% as part of overall cost savings (not because of his performance), and his benefits were reduced. Exhibit N. There is no written 2016 performance review.

In 2017, Mr. Brimmeier struggled in his new position. In May, he complained that he was not being supported and that his emails were being ignored. Again, there is no written performance review. Through the rest of 2017, Mr. Brimmeier's sales and marketing department was unsupported and frustrated. Mr. DeMaria damaged the relationship with Michigan State University with an unprofessional tweet, which he originally denied sending. Joe and Tony DeMaria, also an officer of DBC, continued to ignore Mr. Brimmeier and his input about the business, to undermine him, and to make decisions without him.

By the end of the year, Mr. Brimmeier was frustrated enough to ask for a meeting with Joe, who did not even reply. As Mr. Brimmeier was generating sales

goals and strategies for critical accounts to pursue in 2018, Joe and Tony refused to provide necessary support, even refusing to participate in key meetings. He explained to Joe that he was unhappy in marketing and would prefer his old operational role. J. DeMaria Dep., Exhibit H, at 19-20. His preference was to "go back to my old role as a VP in operations because I felt that that was my strength." Exhibit F, at 178:5-179:13. Still, he was working on making the best of his new position. He respected his role as a long-time DBC employee and wanted to remain loyal to the company.

But the loyalty did not run both ways. What happened next is the central fact in the case. At the end of January, 2018, DBC terminated Mr. Brimmeier's job. Rather than accommodate Mr. Brimmeier's request to return to a high-level operational job, DBC gave him an ultimatum: he could either accept a demotion to project manager or start a completely new position as an owner's representative with a new company called Ally, LLC reporting to Tony DeMaria instead of Joe. Mr. Brimmeier explained that "I think they knew in advance that I wouldn't take the project manager position. I feel like I really had no choice." Exhibit F, at 177:18-20.

Joe DeMaria's Declaration explains that Ally was "a new business." More than that, he states that Ally was a "completely separate business from DBC." DeMaria Decl., Exhibit K, ¶19. Ally was established in March, 2018. Exhibit O; J. DeMaria Dep., Exhibit H, at 21-22, 30:20 (correcting counsel, he noted Mr.

Brimmeier's "employment with Ally"). Tony DeMaria explained the difference between DBC and Ally this way: "Well, he was in Ally, so it's a whole different line of business. Owner's rep is totally different from general contracting. So it's apples and oranges." T. DeMaria Dep., Exhibit P, at 16:23-25. Mr. Brimmeier explained his view of the two different jobs. Exhibit F, at 171:12-19.

His new duties were completely different. He reported to Tony, not Joe. To reinforce the difference between DBC and Ally, Joe told Mr. Brimmeier that effective immediately he was removed from the DBC executive team and could not attend critical "level 10" meetings. DBC eliminated his computer access to sensitive DBC information.  DeMaria Decl., Exhibit K, at ¶19-20. There was a business reason for this separation: to avoid potential conflicts of interest between DBC and Ally. Exhibit F, at 172:10-175:24.

DBC does not take the position that it had "cause" to terminate Mr. Brimmeier in January, 2018 under the Pre-2016 Plan or Section 4(b) of the 2016 Plan; Joe testified that poor job performance would not constitute "cause." J. DeMaria Dep., Exhibit H, at 15-16. As explained below, Mr. Brimmeier's termination without cause triggered his right to receive his banked bonuses under the Pre-2016 Plan or the 2016 Plan.

Mr. Brimmeier's efforts to start Ally's new owner's representative business were undermined from the outset. He was pressured to work in Florida, even though

he explained that he did not want to travel extensively. J. DeMaria Dep., Exhibit H, at 23:15-22. When Mr. Brimmeier was told not to meet with any DBC clients, he complained to Tony, who said he would talk to Joe. That never happened. In fact, Tony refused to support Mr. Brimmeier through the first half of 2018, failing to attend meeting after meeting, refusing to respond to Mr. Brimmeier's input and suggestions (including his marketing and sale strategy), and even failing to invite Mr. Brimmeier to meetings that were critical to Mr. Brimmeier's job. Joe also refused to support Mr. Brimmeier during this time, also cancelling meetings. Mr. Brimmeier submitted numerous OFIs (Opportunity for Improvement) that were completely ignored. He was denied computer access to important business information.

In May, 2018, Mr. Brimmeier received a nominal $5,000 bonus. He expressed his frustrations in his review on May 3. He noted that he was not able to meet his sales goals and that he needed additional support. He concluded that it was a "very disappointing year for me and the company."  Exhibit Q (see Question 8 of 8).  He explained his accomplishments and frustrations. Exhibit R.

Despite Mr. Brimmeier's call for help, Ally ignored him. The situation deteriorated even further in July, 2018 when Tony and Joe became more obvious about undermining and ignoring Mr. Brimmeier, apparently intent on sabotaging his ability to succeed with Ally. Patronizingly, they now call his concerns "milquetoast"

[meaning: feeble, insipid or bland]. DBC's Summary Judgment Brief, at 11. Mr. Brimmeier, faced with this attitude, became concerned that his job was at risk once again.

To summarize the situation as of September, 2018: after 20 years of a successful career, DBC cut Mr. Brimmeier's pay in 2016, changed his job, then terminated his job completely in January, 2018 and moved him to a new job with a new company, following which Ally failed to support him. In October, 2018, Mr. Brimmeier accepted an unsolicited invitation to talk to Rockford Construction about a possible opportunity. As Mr. Brimmeier explained, Rockford is primarily a developer (Rockford's own website https://rockfordconstruction.com/ proclaims that "We're more than just a construction company. From real estate development to property management, we're crafting neighborhoods, businesses and communities.").

In November, 2018, in response to Mr. Brimmeier's concern about Ally's light workload, the DeMarias suggested that there may be work for Tony's brother Mark DeMaria's real estate development company DevMar in Florida. Mr. Brimmeier expressed his concern about re-locating to or traveling extensively to Florida – he and his family had long been comfortably settled in Michigan. Through the rest of the year, Tony and Joe actively ignored Mr. Brimmeier and his efforts to

build the Ally business. They never followed up about the opportunity with DevMar, other than to repeatedly promise an upcoming meeting.

In January, 2019, the situation was untenable. Again euphemistically, Joe declares that "it was impossible" by January, 2019 to put Mr. Brimmeier back into his operational role with DBC as that position had been "phased out." DeMaria Decl., Exhibit K, ¶22. Mr. Brimmeier was not receiving any support in his role with Ally. Tony was ignoring direct requests. Not surprisingly given his experience over the preceding two years, Mr. Brimmeier was concerned that he was about to be fired from Ally as he had been fired from DBC, so he moved forward with the Rockford interview process.

Mr. Brimmeier walked into Joe's office on January 17 or 18 to clarify his job status (there is some confusion in the record about the date, but it does not matter). Mr. Brimmeier's description of the meeting is found at Exhibit F, at 202-209. Mr. Brimmeier explained that he needed more support. J. DeMaria Dep., Exhibit H, at 56:3-14. Mr. Brimmeier said he was worried about being fired. Joe DeMaria described Mr. Brimmeier's attitude this way, "He seemed like he had a lot of urgency that he wanted to really push me whether he was going to stay at Ally or not, like he had some other decision to make or something. There was something -- there was a weird vibe there. He was really pushing me hard." J. DeMaria Dep., Exhibit H, at 52:5-10. Joe said something that could only have put *more* pressure on Mr.

11

Brimmeier. As he testified, "I made the comment we really need to focus on getting enough revenue and profit to at least cover his salary." J. DeMaria Dep., Exhibit H, at 55:5-7.

The issue of working in Florida came up again, and Joe told Mr. Brimmeier that he would be talking to Mark DeMaria on the following Friday, January 25, and would get back to Mr. Brimmeier. J. DeMaria Dep., Exhibit H, at 25. Joe explained that "I told Tony we needed to meet with Mark DeMaria so we could get back to Mark Brimmeier. And, really, there's nothing else to do until we met with Mark DeMaria on that Friday." *Id.*, at 40:13-16.

The scheduled conversation between the three DeMarias took place on Friday, January 25. According to Joe, Mark DeMaria repeated his request that Mr. Brimmeier travel extensively to Florida. Joe knew Mr. Brimmeier was not interested, but Mark DeMaria did not offer any other concrete suggestions. The DevMar opportunity seemed to be at a dead end. J. DeMaria Dep., Exhibit H, at 42:15-44:16 (Mark DeMaria "didn't think it was going to work").

Joe and Tony had promised Mr. Brimmeier that they would get back to him about their conversation with Mark DeMaria.  J. DeMaria Dep., Exhibit H, at 44:17-45:16. They knew how important this was to Mr. Brimmeier, they knew he believed he was being pushed out, and they knew they had reached a dead end with DevMar. But rather than be upfront with Mr. Brimmeier, they decided to ignore him, again.

According to Joe, he "had a meeting toward the end of the day. Went home. Didn't think there was any urgency." J. DeMaria Dep., Exhibit H, at 45:23-24. He added "In the normal course of business it takes days, sometimes, to get back to people. I don't understand what the issue is here." J. DeMaria Dep., Exhibit H, at 47-48. When asked why he did not follow up on Monday the 28th, he testified "I don't recall. I'm sure I was pretty busy. I know Tony has a lot of meetings on Monday. I don't recall. Probably had a lot of meetings going on. I didn't go back and look at my calendar." J. DeMaria Dep., Exhibit H, at 63:12-15. Tony echoed Joe's sentiments, testifying that he did not see any sense of urgency about responding to Mr. Brimmeier. T. DeMaria Dep., Exhibit P, at 11-12.

This testimony captures everything wrong with the relationship – Joe testified that he appreciated Mr. Brimmeier's sense of urgency at the January 18 meeting, but did not care enough, and was not professional enough, to even email or text Mr. Brimmeier on Friday the 25th or Monday the 28th. He specifically knew Mr. Brimmeier was worried about being pushed out (J. DeMaria Dep., Exhibit H, at 49:13-16, 54:5-11), did nothing to dispel that worry, and was willing to let him leave.

Not having heard back from Joe or Tony by the 25th, Mr. Brimmeier wrote up a resignation letter that day. He wanted to deliver it to Tony but Tony was not in the office. The DeMarias did not contact him over the weekend, or on Monday the

28th. At that point, Mr. Brimmeier was completely frustrated and overwhelmingly concerned about his future and his ability to support his family.

He came to the DBC office on Tuesday, January 29 and found Tony. He offered his resignation letter. Mr. Brimmeier's testimony is found at Exhibit F, at 220-221, 229-235. He offered that he would continue to promote Ally if he could also go back into marketing and sales with DBC. This offer was rejected. Neither Joe nor Tony DeMaria made any suggestions about how Ally might continue to employ Mr. Brimmeier, including any suggestions about the opportunity in Florida. Indeed, based on Joe and Tony's discussions with Mark DeMaria, there were no such opportunities.

Mr. Brimmeier tried one more time. Even though he had accepted a position with Rockford, his preference was to remain loyal to the DeMarias. On February 8, he texted Tony with "an offer to stay" with certain demands about compensation, work conditions, and his deferred compensation payment. Exhibit S; Exhibit F, at 243-249. If the DeMarias had agreed, Mr. Brimmeier would have told Rockford that he was staying. But they did not agree. Mr. Brimmeier had no choice but to start work with Rockford.

## ARGUMENT

The key facts are (1) DBC terminated Mr. Brimmeier without cause in 2018; and (2) under the Pre-2016 Plan and the 2016 Plan, DBC owes him $412,019. Under

the unwritten Pre-2016 Plan, DBC failed to pay Mr. Brimmeier in January, 2018. If the 2016 Plan applies, DBC refused to pay Mr. Brimmeier as of September 2, 2019, when he turned 60. Mr. Brimmeier is therefore entitled to judgment under Count One (29 U.S.C. §1132(a)) and Count Two (Breach of Contract).

## LEGAL STANDARDS

29 U.S.C. §1132(a) provides that **"**A civil action may be brought (1) by a participant or beneficiary…(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan…"

The Pre-2016 Plan was unwritten but is still subject to ERISA. See *Brown v. AMPCO-Pittsburgh Corp.,* 876 F.2d 546, 551 (6th Cir. 1989). Since the Plan was unwritten, there is no internal administrative procedure required, no exhaustion requirement and therefore no record to review. See 29 C.F.R. § 2560.503-1(l)(1)("Except as provided in paragraph (l)(2) of this section, in the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the

merits of the claim."); *Wallace v. Oakwood Healthcare, Inc.* 954 F.3d 879 (6th Cir. 2020).

Mr. Brimmeier files this motion under Rule 56.  Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.,* 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, `the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

16

587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander,* 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis,* 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.,* 355 F.3d 515, 533 (6th Cir. 2004)).

This motion may also be deemed a motion for a judgment on the administrative record regarding the 2016 Plan, to the extent that Plan applies. In *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring), the Sixth Circuit held that when deciding a case such as this, the Court "should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly." As this Court has noted, "[c]ourts do not use summary judgment procedures for deciding [ERISA] benefit claim denials; rather, parties can file cross

motions for judgment on the administrative record . . . ." *Zack v. McLaren Health Advantage, Inc.,* 340 F. Supp. 3d 648, 655 (E.D. Mich. 2018).

### 1.  MR. BRIMMEIER WAS TERMINATED FROM DBC

Under the unwritten Pre-2016 Plan, Mr. Brimmeier was entitled to be paid his banked bonus because DBC terminated his employment with DBC without cause in January, 2018. Exhibits B, C, E, G and I describe the evolving and inconsistent terms of the Pre-2016 Plan but those documents, along with the deposition testimony, establish very clearly that termination without cause was a trigger. There is no dispute on this point. Nor is there a dispute that Mr. Brimmeier was terminated from DBC without cause – the evidence does not suggest that Mr. Brimmeier quit or that he was terminated for cause.

DBC may claim that Mr. Brimmeier continued to work for DBC, but the evidence is undisputed to the contrary – he went to work for a separate company. Under Michigan law, "there is a presumption that the corporate form will be respected." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,* 475 F.3d 783, 798 (6th Cir. 2007). Even if parties are owned by the same family, they are distinct legal entities and must be treated as such. *See Lim v. Miller Parking Co.,* 560 B.R. 688 (E.D. Mich. 2016).

121117/17582.0001

Payment was due upon termination from DBC. Section 409A allows a "separation from service" to be a payment trigger for deferred compensation. There is no 10-year payout or age requirement – those conditions appeared for the first time in the written 2016 Plan.

DBC's January, 2018 termination of Mr. Brimmeier is also a trigger under the 2016 Plan, if that plan even applies. Section 2(a) provides that Mr. Brimmeier is entitled to his "Age 60 Distributions" when he turned 60 in September, 2019 (the Court already rejected DBC's argument that Mr. Brimmeier must be employed on his 60th birthday). The next step is to look at Section 4, which states the terms of forfeiture. DBC relies on Section 4(a), specifically that Mr. Brimmeier "terminated his…employment" before turning 65. As the facts listed above demonstrate, Mr. Brimmeier was not the one who "terminated his employment" from DBC. DBC terminated his employment in January, 2018.

DBC's argument about termination actually relates to Mr. Brimmeier's subsequent termination from Ally in early 2019. But Ally's subsequent termination of Mr. Brimmeier is of no consequence for the purpose of this motion because DBC had already terminated Mr. Brimmeier. Ally did not have its own deferred compensation plan, written or unwritten.  Ally did not provide Mr. Brimmeier with any "banked" bonuses. Further, if and when Mr. Brimmeier's termination from Ally

19

becomes relevant to this case, Mr. Brimmeier intends to establish that he was constructively terminated from Ally.

## 2. THE 2016 PLAN DOES NOT MODIFY THE TERMS FOR THE PERIOD BEFORE IT WAS IMPLEMENTED

Since we know that DBC terminated Mr. Brimmeier in January, 2018, we know there was a triggering event under the Pre-2016 Plan *and* the 2016 Plan. We know that there was no set age for distributions under the Pre-2016 Plan and that the age trigger under the 2016 Plan was when Mr. Brimmeier turned 60 in September, 2019. We know there was no 10-year payout under the Pre-2016 Plan. Therefore, if Mr. Brimmeier's banked bonuses are covered by the Pre-2016 plan, DBC should be ordered to pay him $412,019 immediately. If the bonuses are covered by the 2016 Plan (even though DBC did not make any contributions after implementing the Plan), his distributions should have started on May 31, 2020.

DBC argues that the 2016 Plan covers the entire amount, hoping to pay over 10 years. DBC raised this issue earlier and the Court disagreed, calling the 2016 Plan ambiguous on this point. Given the facts revealed in discovery, the Court can conclude for this motion that the 2016 Plan does not apply for the following reasons.

The language of the Plan does not support DeMaria, which relies on the merger clause in Section 9. But Section 9 does not and cannot abrogate any rights Mr. Brimmeier had through April 7, 2016. To the contrary, Section 9 only states that it supersedes previous agreements "relating to its subject matter." Plainly, this means

20

that the Plan is the only document that governs the new "Program" being "established" in 2016 according to the opening sentence. When the terms of an ERISA plan are undefined, traditional principles of contract interpretation require a plan administrator to "interpret the provisions [of the plan] according to their plain meaning in an ordinary and popular sense." *Williams v. Int'l. Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000). The newly-established "Program" is the "subject matter"; no other drafts or other versions of the Plan relating to this "subject matter" would be valid. But nothing in Section 9 speaks to the pre-2016 dealings between the parties related to Mr. Brimmeier's bonuses, ***all of which had been "banked" already***.

Here are sections of the Plan that further support Mr. Brimmeier's position, in addition to the first four forward-looking words ("DeMaria desires to establish…"):

- An employee might receive future benefits "pursuant to this Program" – there is no reference to the past benefits Mr. Brimmeier received. He did not receive any benefits "pursuant to" the Plan;
- An employee may, in the future, receive these benefits "in conjunction with" the employee's annual review — Mr. Brimmeier did not receive such benefits;
- Such future benefits are defined as "Deferred Compensation amounts" — that term does not include past benefits;
- All such amounts "will be reflected in an unfunded bookkeeping account." No such amounts were credited to Mr. Brimmeier;
- Section 6 describes the treatment of any "Deferred Compensation payable under this Agreement" — the pre-2016 amounts to which Mr. Brimmeier was entitled were not "payable under this Agreement."

If DBC wanted to say that the 2016 Plan was to retroactively modify the deferred compensation plan in effect for the prior 15 years, and thereby change the

21

rules to restrict Mr. Brimmeier's right to receive payments already "banked," it would have been easy enough for DBC to do that as a matter of contract drafting. Of course, this begs the question: how can an employer who had retained an employee for 15 years based on a specific promise about deferred bonus payments change the rules midstream?

In short, DeMaria reads the very general merger clause in Section 9 too broadly, and unfairly to Mr. Brimmeier. See *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 781 (10th Cir. 1998)(reversing the District Court for reading a merger clause "too broadly.")  The 2016 Plan does not apply.

## 3. MR. BRIMMEIER IS ENTITLED TO INTEREST AND ATTORNEY FEES

Because Mr. Brimmeier was entitled to a fixed amount on a fixed date, he is entitled to recover pre-complaint interest since the payment was due.  As the Sixth Circuit explained in *JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co.,* 750 F.3d 573, 584-85 (6th Cir. 2014):

> Generally, Michigan courts have included [pre-complaint] interest as an element of damages as a matter of right where the amount claimed is liquidated." (citations omitted) Damages are liquidated "where `the amount thereof is fixed, has been agreed upon, or is capable of ascertainment by mathematical computation or operation of law.'" (citations omitted).

"Since ERISA does not address the propriety of awarding prejudgment interest, such interest may be awarded in the discretion of the district

court." *Drennan v. General Motors Corp.,* 977 F.2d 246, 253 (6th Cir. 1992). "Awards of prejudgment interest are compensatory, not punitive, and a finding of wrongdoing by the defendant is not a prerequisite to such an award." *Id.*

The interest rate should be 5%. *RSM Richter, Inc. v. Behr America, Inc.,* 781 F.Supp.2d 511, 517 (E.D. Mich. 2011)("In cases where the amount claimed is liquidated, 'interest has generally been allowed from the date when the claim accrued or in other words, `from the date compensation would have been due had it been paid voluntarily,'" (citations omitted) until 'payment thereof or until judgment.' M.C.L. § 438.7. Interest is calculated at 5% per annum. M.C.L. § 438.31; *see also, Holland v. Earl G. Graves Publishing Co.,* 33 F.Supp.2d at 584.")

Under ERISA, the Court also has the discretion to award him attorney fees. "In an [ERISA] action by a plan participant, beneficiary, or fiduciary, the court, in its discretion, `may allow a reasonable attorney's fee and costs of action to either party." *First Tr. Corp. v. Bryant,* 410 F.3d 842, 851 (6th Cir. 2005) (quoting 29 U.S.C. § 1132(g)(1)). The Sixth Circuit has outlined a five-factor test for courts to consider when assessing whether to award attorney fees and costs in ERISA actions:

> (1) The degree of the opposing party's culpability or bad faith;
> (2) The opposing party's ability to satisfy an award of attorney's fees;
> (3) The deterrent effect of an award on other persons under similar circumstances;
> (4) Whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significantly legal questions regarding ERISA; and
> (5) The relative merits of the parties' positions.

121117/17582.0001

*First Tr. Corp.,* 410 F.3d at 851 (quoting *Sec'y of the Dep't of Lab. v. King,* 775 F.2d 666, 669 (6th Cir. 1985)).

All the factors favor Mr. Brimmeier:

(1) DBC, trying to save money, intentionally orchestrated a scenario in which it tried to avoid a clear obligation to pay him deferred compensation;

(2) DBC, a large regional construction company, can afford to pay;

(3) Other employers should be deterred from withholding well-earned retirement benefits;

(4) Mr. Brimmeier's case should help other DBC employees avoid the same fate;

(5) DBC's continuously evolving defenses have already been soundly rejected, and it has no defense to this motion.

The amount of attorney fees should be determined through a subsequent motion.

## CONCLUSION AND RELIEF REQUESTED

Because it is not disputed that DBC terminated Mr. Brimmeier without cause in January, 2018, and because it is not disputed that this is a triggering event, the Court should rule that Mr. Brimmeier is entitled to received his banked bonuses.

24

121117/17582.0001

In addition, because these bonuses are governed by the Pre-2016 Plan, DBC should be ordered to immediately pay a lump sum. There was no age restriction and no 10-year payout condition.

Mr. Brimmeier should also recover interest and attorney fees.

FRANK AND FRANK LAW

*/s/ Jonathan B. Frank*
JONATHAN B. FRANK (P42656)
JANETTE E. FRANK (P42661)
Attorneys for Plaintiff

Dated: July 30, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2021, the foregoing paper was e-filed with the Clerk of the Court using the electronic filing system, which will send notification of such filing to all parties of record.

*/s/ Amy Zielinski*
Amy Zielinski

121117/17582.0001