UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK BRIMMEIER,

        Plaintiff,          Civil Action No. 20-cv-10426
                                        HON. BERNARD A. FRIEDMAN

vs.

DeMARIA BUILDING
COMPANY, *et al.*,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AS MOOT**

I.    Introduction

Mark Brimmeier commenced this action against DeMaria Building Company ("DBC") for refusing to pay him the benefits he accrued under the company's deferred compensation "program."[1] The amended complaint seeks to recover the outstanding deferred compensation benefits pursuant to the Employee Income Retirement Security Act of 1974 ("ERISA") and alleges a state law claim for breach of contract.

---

[1] Brimmeier also sued DeMaria Building Company's deferred compensation program. The Court will refer to the company and the program, collectively, as "DBC."

Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 38, 48), DBC's motion to dismiss the amended complaint (ECF No. 40), as well as the responses and replies associated with the motions. (ECF Nos. 42-43, 45, 49-51). The parties also submitted supplemental briefs. (ECF Nos. 54-55). The Court will decide the motions without oral argument pursuant to E.D. Mich. LR 7.1(f)(2). For the following reasons, the Court shall grant DBC's motion for summary judgment, deny Brimmeier's cross-motion for summary judgment, and deny DBC's motion to dismiss the amended complaint as moot.

II.   Background

DBC is a general contractor servicing the healthcare, educational, industrial, and commercial sectors. (ECF No. 48-2, PageID.1531, Tr.181:5-8). The company hired Brimmeier as one of its superintendents in 1996, elevated him to assistant vice-president for healthcare in 2001, and subsequently promoted him to vice-president of that division in 2003. (ECF No. 48-2, PageID.1497, Tr. 44:10-13; PageID.1498, Tr. 46:1-8).

DBC formed what it called a "Bonus Program" in 2001. (ECF No. 48-3, PageID.1638, ¶ 7; ECF No. 50-2, PageID.1832, PageID.1834). The program sought to encourage "key, highly compensated employees" to remain with the company by deferring payment of half their annual bonus until they retired. (ECF No. 48-3, PageID.1638, ¶¶ 5-6; ECF No. 50-2, PageID.1834). DBC invested 50 percent of the

2

deferred payment in a "retirement benefit" and carried the remaining 50 percent into the following year. (ECF No. 50-2, PageID.1834). The parties contest the meaning of "retirement," whether the program included a minimum retirement age, and the difference between "retirement" and "voluntary termination of employment." These disparate interpretations mostly result from DBC's practice of conveying the program's terms to Brimmeier verbally. (ECF No. 48-2, PageID.1532, Tr. 185:19-23; ECF No. 48-4, PageID.1644, Tr. 7:2-3). The parties seem to agree that Brimmeier would forfeit his deferred compensation benefits if he resigned from the company. (ECF No. 48-4, PageID.1644, Tr. 7:5-6; ECF No. 48-5, PageID.1688).

From 2001 through 2015, Brimmeier accrued deferred compensation benefits totaling $412,019. (ECF No. 38-2, PageID.1020; ECF No. 48-3, PageID.1639, ¶ 9; ECF No. 48-8, PageID.1695). That all changed in April 2016, when DBC supplanted the unwritten bonus program (hereinafter, the "pre-2016 program") with a written deferred compensation program (hereinafter, the "2016 program"). (ECF No. 48-3, PageID.1639, ¶ 14; ECF No. 50-2, PageID.1847-51).

The 2016 program requires employee-participants to reach the minimum age of 60 before receiving deferred compensation "distributions"; it distributes the accrued deferred compensation benefits in ten equal installments annually; it provides that employee-participants will forfeit their deferred compensation benefits should they resign from DBC prior to reaching age 65; and it includes an integration

3

clause. (ECF No. 50-2, PageID.1847-49). Brimmeier never accrued deferred compensation benefits under the 2016 program. (ECF No. 38-2, PageID.1021-23; ECF No. 48-3, PageID.1640, ¶¶ 15-16; ECF No. 48-8, PageID.1699).

2016 also marked a significant shift in Brimmeier's responsibilities. DBC eliminated his position as vice-president of healthcare at year's end and made him executive vice-president of sales and marketing. (ECF No. 38-2, PageID.889, ¶ 4, PageID.1041; ECF No. 48-3, PageID.1640, ¶ 17). The company then cut his salary by 5 percent. (ECF No. 38-2, PageID.1041).

By January 2018, DBC presented Brimmeier with two options. He could either (1) remain with DBC as a senior project manager (in effect, a demotion), or (2) assume a position with Ally, LLC – an owner's representative business that DBC's president, Joseph DeMaria, had recently formed with his cousin.[2] (ECF No. 38-2, PageID.890-91, ¶ 8; ECF No. 48-2, PageID.1530, Tr. 176:4-10; ECF No. 48-3, PageID.1640, ¶¶ 18-19; ECF No. 48-4, PageID.1665, Tr. 91:15-18; ECF No. 48-11, PageID.1712, Tr. 16:10). Brimmeier opted for Ally, but his tenure there was short-lived. (ECF No. 48-2, PageID.1530, Tr. 176:10). He separated from the company on February 8, 2019. (ECF No. 48-2, PageID.1547, Tr. 242:7-12; ECF No. 48-3, PageID.1641, ¶ 23). The parties dispute whether DBC and/or Ally

---

[2] Brimmeier explained that owner's representatives in the construction industry are "utilized to work on the owner's behalf, make decisions on the owner's behalf, and help them with a project." (ECF No. 48-2, PageID.1529, Tr. 171:12-14).

constructively discharged Brimmeier and, if so, when they discharged him (either in January 2018 or February 2019). In light of the Court's findings, neither of these issues are germane to the resolution of the case.

Upon turning 60, Brimmeier requested that DBC pay out his deferred compensation benefits. (ECF No. 37, PageID.815, ¶ 58; ECF No. 37-2, PageID.826-28). DBC's board of directors denied the claim on the ground that Brimmeier resigned from DBC and/or Ally before his 65th birthday. (ECF No. 37-2, PageID.830-31). Brimmeier appealed that determination unsuccessfully. (*Id.*, PageID.844-48, 850-51). This lawsuit followed. (ECF No. 1).

III. <u>Legal Standards</u>

A moving party is entitled to summary judgment where the "materials in the record" do not establish the presence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c). All the evidence, along with all reasonable inferences, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

IV. <u>Analysis</u>

    A. *ERISA – Statutory Overview*

The Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1381, governs employer-administered employee benefit plans. Congress enacted ERISA "to ensure that if a worker has been promised a defined

5

pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it." *United Food & Commercial Workers Union v. Rubber Assocs., Inc.*, 812 F.3d 521, 525 (6th Cir. 2016) (cleaned up).

The statute defines an "employee benefit plan" as an employee welfare benefit plan, an employee pension benefit plan, or a plan comprising elements of both. 29 U.S.C. § 1002(3).

An ERISA employee pension benefit plan is a:

> *plan, fund, or program* which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or *as a result of surrounding circumstances* such plan, fund, or program –
>
> (i) provides retirement income to employees, or
>
> (ii) *results in a deferral of income by employees for periods extending to the termination of covered employment or beyond*, . . .

29 U.S.C. § 1002(2) (emphasis added). ERISA contains six remedial provisions. *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 371 (6th Cir. 2015) (en banc). The pertinent one to this litigation authorizes plan participants to commence civil lawsuits and recover the benefits owed to them under the plan. 29 U.S.C. § 1132(a)(1)(B).

>   B.   The Pre-2016 Program Governs Whether Brimmeier Is Entitled to Recover Deferred Compensation Benefits

At the outset, the parties diverge over which program governs Brimmeier's entitlement to deferred compensation. The answer to that question is now well-settled.

When evaluating the claimant's entitlement to benefits under successive plans (or successive plan amendments) federal courts review the plan terms in effect when the benefits accrued. *See Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 744-45 (2004) (looking to the plan terms under which the plaintiff accrued benefits to conclude that a subsequent "change of terms" reduced his promised benefits); *see also Deschamps v. Bridgestone Ams., Inc.*, 840 F.3d 267, 280 (6th Cir. 2016) (holding that "we must look to the terms of the [previous] Plan in ascertaining which, if any, benefits Deschamps accrued prior to the amendment."); *Thornton v. Graphic Communs. Conf. of the Int'l Bhd. of Teamsters Supplemental Ret. & Disability Fund*, 566 F.3d 597, 606 (6th Cir. 2009) ("what amounts to an 'accrued benefit' depends strictly on the terms of the pension plan(s) in effect while the employee was engaged in covered employment.").

Brimmeier's deferred compensation benefits accrued solely under the pre-2016 program. DBC's financial statements show that Brimmeier's total accruals under the pre-2016 program reached $412,019 as of December 31, 2015. (ECF No. 38-2, PageID.1020; ECF No. 48-8, PageID.1695). That figure remained the same

7

through December 31, 2019, the year he separated from DBC/Ally. (ECF No. 38-2, PageID.1021-23; ECF No. 48-8, PageID.1699). Not to mention, DBC's president, Joseph DeMaria, acknowledged that Brimmeier did not accrue any deferred compensation benefits under the 2016 program. (ECF No. 48-3, PageID.1640, ¶¶ 15-16).

DBC suggests that the pre-2016 program merged into the 2016 program through the latter program's integration clause, thereby converting the pre-2016 program into an ERISA plan. (ECF No. 45, PageID.1202-04). The structure and language of the 2016 program undercuts this theory. The integration clause provides that "[t]his Program supersedes all agreements, promises, or understandings previously made between the parties relating to its subject matter." (ECF No. 50-2, PageID.1849, ¶ 9). Nothing in this formulation demonstrates that the parties intended for the integration clause to operate retroactively.

The 2016 program's attendant sections confirm this reading. None of them address DBC's treatment of the deferred compensation benefits Brimmeier already accrued before April 7, 2016 (the 2016 program's effective date). Instead, the 2016 program solely encompasses "[t]he benefits *to be paid* as Deferred Compensation" and "[a]ny Deferred Compensation *payable under this Agreement*" – terms that connote deferred compensation benefits accruing *after* the 2016 program became effective. (*Id.*, PageID.1847, ¶ 2) (emphasis added). Nor has DBC come forward

8

with any precedent authorizing an employer's unilateral and retroactive conversion of a non-ERISA plan into an ERISA plan.[3]

Consequently, the pre-2016 program determines whether Brimmeier may recover deferred compensation benefits.

C. *The Pre-2016 Program Is Not an ERISA Plan*

Over thirty years ago, the Sixth Circuit Court of Appeals adopted the Eleventh Circuit's test in *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) for evaluating whether a "plan, fund, or program" qualifies as an ERISA employee benefit plan. *Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 551 (6th Cir 1989). The relevant inquiry under *Dillingham* is "whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *International Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991). The Sixth Circuit continues to apply this standard today. *See Wolf v. Causley Trucking, Inc.*, 719 F. App'x 466, 470 (6th Cir. 2017).

The existence of an ERISA plan raises a factual question that is "answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Thompson v. American Home Assur. Co.*, 95 F.3d 429, 434 (6th

---

[3] The Court concludes that the pre-2016 program is not an ERISA plan for the reasons explained in section IV.C. of this opinion and order.

Cir. 1996); *see also Reedstrom v. Nova Chems., Inc.*, 96 F. App'x 331, 334 (6th Cir. 2004). The analysis is more nuanced in cases like this one, where the employer never reduced the plan's entire set of terms to writing. And "the concerns underlying" *Dillingham* "are more acute when no writing exists to evidence the plan" or its salient terms. *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1378 (7th Cir. 1997).

Assuming the pre-2016 program meets *Dillingham*'s first three elements, it still cannot satisfy *Dillingham*'s final prong, *i.e.*, that a reasonable person be able to ascertain the procedures for receiving benefits. On this score, a jumble of internal notes, inconsistent employee compensation summaries, and a litany of conflicting declarations and deposition testimony, all point to one inescapable conclusion: that no reasonable person could discern the procedures for obtaining deferred compensation under the pre-2016 program.

First consider the documentary evidence. As early as April 2011, DBC's president, Joseph DeMaria, noted that Brimmeier "mentioned [the] bonus program" during an in-person meeting and expressed "how he sometimes is confused." (ECF No. 50-2, PageID.1832). The exchange prompted DeMaria to review an employee compensation summary with Brimmeier and explain "the banking process and loss of deferred comp if he quit." (*Id.*). He placed no other conditions on Brimmeier's receipt of deferred compensation.

The 2012 employee compensation summary explained that DBC would "bank" 50 percent of Brimmeier's earned bonus, with half that amount "invested in [a] Retirement Benefit" and the other half "carried into [the] following year." (ECF No. 50-2, PageID.1834). The summary imposed no forfeiture conditions in the event Brimmeier voluntarily terminated his employment. The 2013 summary largely tracked the 2012 version, except that it included the following caveat: "Banked Retirement Benefit forfeited upon voluntary termination of employment." (ECF No. 48-5, PageID.1688). The 2014 summary extended this language to encompass "voluntary termination[s] of employment" as well as "termination[s] with cause." (ECF No. 48-6, PageID.1690). Then in 2015, DBC reversed course and deleted the "termination with cause" condition from that year's summary. (ECF No.48-7, PageID.1692).

The parties' declarations and deposition testimony provide even less clarity. For example, DeMaria attested that Brimmeier would have been entitled to a deferred compensation payout under the pre-2016 program if he retired from DBC at age 65. (ECF No. 48-3, PageID.1638). But none of the DBC employee compensation summaries mention that condition. Nor is there any indication that DeMaria discussed retirement, or a minimum retirement age, when he explained the pre-2016 program terms to Brimmeier at their April 2011 meeting. (ECF No. 50-2, PageID.1832).

11

DeMaria's deposition testimony contradicts the employee compensation summaries. He testified that employee-participants would retain their entitlement to deferred compensation benefits at age 65 even if DBC previously terminated them without cause (ECF No. 48-4, PageID.1644, Tr. 8:16-18); that vested employee-participants would receive their deferred compensation in 10 equal payments over the course of 10 years (*Id.*, PageID.1645, Tr. 11:15-22); and that the definition of termination "for cause" would include "embezzlement, [or] something to harm the company. It covered a range of things we didn't have detailed." (*Id.*, PageID.1646, Tr. 15:24-16:1). But again, none of the DBC employee compensation summaries reference these key provisions. DeMaria could not recall any document imposing a minimum retirement age. (*Id.*, PageID.1645, Tr. 11:10-14). What is more, his declaration summarizing the pre-2016 program omits the 10-year payout schedule and the "for cause" termination language. (ECF No. 48-3).

Brimmeier's testimony departed markedly from DeMaria's. He stated that DBC never defined the term "retirement" or required him to attain a minimum retirement age before receiving deferred compensation benefits. (ECF No. 48-2, PageID.1502, Tr. 62:25-63:8). Brimmeier believed he would be entitled to collect deferred compensation even if he retired at age 45 and then worked for another company. (*Id.*, 63:15-20). In his words, "[m]y understanding was when I retired, that [deferred compensation] money was mine." (*Id.*, PageID.1505, Tr. 74:7-8; *see*

*also* PageID.1501, Tr. 61:6-8). Nowhere did DBC or DeMaria explain the procedures for employee-participants to receive deferred compensations benefits under the pre-2016 program. Even if these procedures did exist (whether in written form or through verbal communications), the record is devoid of any evidence that would allow a reasonable person to ascertain what they were. *International Resources*, 950 F.2d at 297.

The pre-2016 program is no different than the deferred compensation plan in *Hughes v. Zurz*, 298 F. App'x 404 (6th Cir. 2008). There, the estate of a former credit union executive sued to recover his deferred compensation benefits under ERISA. The district court awarded summary judgment to the defendants in part because the deferred compensation plan did not qualify for ERISA protection. The Sixth Circuit Court of Appeals agreed. Affirming the district court, the Sixth Circuit concluded that, among other things, a reasonable person could not ascertain the procedures for obtaining benefits from the credit union's deferred compensation plan, *i.e.*, the last *Dillingham* prong. *Id.* at 413-16. The Sixth Circuit held that "there is little doubt that no claims procedure existed for deferred compensation benefits since there was . . . no indication of how the benefits would be received." *Id.* at 415. DBC's pre-2016 program suffers from this same defect and warrants the same treatment – it does not qualify as an ERISA plan.

13

The Court reaches this holding from a unique vantage point. After directing the parties to brief whether the pre-2016 program qualifies as an ERISA plan under *Dillingham*, both sides concluded that the program *is in fact* an ERISA plan. (ECF No. 54, PageID.1895; ECF No. 55, PageID.1932). The Court respectfully disagrees for the following reasons.

*First*, DBC presupposes that the pre-2016 program is an ERISA plan without explaining the methodology it employs to arrive at that determination. The company's position is basically tautological – the pre-2016 program is an ERISA plan because it is "a particular type of non-qualified deferred compensation *plan* referred to as a top-hat *plan*." (ECF No. 55, PageID.1933) (emphasis added). The *Dillingham* test supplies an objective framework that defines what makes an ERISA plan a "plan." The pre-2016 program does not fit the bill.

*Second*, whether the pre-2016 program "results in a deferral of income . . . for periods extending to the termination of covered employment or beyond" does not alone establish that the program is subject to ERISA. (*Id.*, PageID.1933). It must still meet the requirements of a "plan, fund, or program" under *Dillingham*. 29 U.S.C. § 1002(2)(A). Federal courts – including the Sixth Circuit – have consistently applied *Dillingham* to evaluate whether deferred compensation arrangements qualify for ERISA protection. *See, e.g., Hughes*, 298 F. App'x at 411-

14

16; *Williams v. WCI Steel Co.*, 170 F.3d 598, 602-04 (6th Cir. 1999); *Hughes v. White*, 467 F. Supp. 2d 791, 801-05 (S.D. Ohio 2006).

*Third*, the parties' agreement as to the existence of an ERISA plan is not dispositive where that same "plan" fails the *Dillingham* test. "[L]ack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties." *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934). A federal court must satisfy itself that it has subject-matter jurisdiction over a case. *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845 (6th Cir. 2007). This responsibility "carries no less force in a case wherein the plaintiff invokes jurisdiction under ERISA to recover for the purportedly erroneous denial of benefits under an employee benefits plan." *Arnold v. Lucks*, 392 F.3d 512, 517 (2d Cir. 2004). "Indeed, it is not only proper but necessary for a district court to satisfy itself that ERISA applies" to the benefit plan under consideration "because it is ERISA that provides the jurisdictional basis to address the plaintiff's claims." *Id.* The parties' shared view that the pre-2016 program falls within ERISA's ambit in no way precludes the Court from undertaking its own *Dillingham* analysis and drawing the opposite conclusion.

*Lastly*, the supplemental briefing itself underscores that no reasonable person could ascertain the pre-2016 program's "procedures for receiving benefits" – again, *Dillingham*'s final prong. According to DBC, "the procedure for receiving benefits was retirement" from the company. (ECF No. 55, PageID.1942). Brimmeier

15

alternatively proposes that the "triggering event" for collecting benefits was his "involuntary/constructive termination." (ECF No.54, PageID.1895). Beyond simply receiving the accrued benefits upon a "triggering event," neither party articulates the concrete, practical steps employee-participants would have to undertake to obtain their deferred compensation. (ECF No. 54, PageID.1895; ECF No. 55. PageID.1942). And "[t]o do little more than write a check hardly constitutes the operation of a benefit plan." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987).

Because the pre-2016 program fails the *Dillingham* test, Brimmeier cannot recover deferred compensation benefits pursuant to 29 U.S.C. § 1132(a)(1). The ERISA claim is, therefore, dismissed.

### D. Supplemental Jurisdiction

The dismissal of the ERISA claim ultimately deprives the Court of original jurisdiction. Brimmeier did not state a plausible claim for relief under ERISA, so there is no federal question left to decide. 28 U.S.C. § 1331. And as the parties are not diverse, jurisdiction over the remaining breach of contract claim is improper under 28 U.S.C. § 1332. (ECF No. 37, PageID.807-08) (stating that Brimmeier "is a resident of Macomb, Michigan" and DBC "is a Michigan corporation with its principal place of business [in] Novi, Michigan").

16

That leaves open the exercise of supplemental jurisdiction. A district court "may decline to exercise supplemental jurisdiction over a claim" where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007). Supplemental jurisdiction "should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).

Here, the likelihood of multiple litigations is minimal. And the parties raise novel issues of contractual interpretation under state law. Because Michigan state courts are best suited to address those questions, the Court declines to exercise supplemental jurisdiction over the pendent breach of contract claim. Dismissal on this ground "is of course without prejudice." *Experimental Holdings*, 503 F.3d at 522. Accordingly,

IT IS ORDERED that DBC's motion for summary judgment (ECF No. 48) is granted.

IT IS FURTHER ORDERED that Brimmeier's cross-motion for summary judgment (ECF No. 38) is denied.

IT IS FURTHER ORDERED that DBC's motion to dismiss the amended complaint (ECF No. 40) is denied as moot.

Dated: February 17, 2022
       Detroit, Michigan

s/Bernard A. Friedman
Bernard A. Friedman
Senior United States District Judge